**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 39067**

| | | |
|---|---|---|
| **PHILLIP THOMAS LEONARD, JR.,** | ) | **2013 Unpublished Opinion No. 566** |
| | ) | |
| Petitioner-Appellant, | ) | **Filed: July 2, 2013** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **STATE OF IDAHO,** | ) | **THIS IS AN UNPUBLISHED** |
| | ) | **OPINION AND SHALL NOT** |
| Respondent. | ) | **BE CITED AS AUTHORITY** |
| | ) | |

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. Bradly S. Ford, District Judge.

Judgment denying petition for post-conviction relief, <u>affirmed</u>.

Nevin, Benjamin, McKay & Bartlett; Robyn Fyffe, Boise, for appellant. Robyn Fyffe argued.

Hon. Lawrence G. Wasden, Attorney General; Russell J. Spencer, Deputy Attorney General, Boise, for respondent. Russell J. Spencer argued.

_____

GUTIERREZ, Chief Judge

Phillip Thomas Leonard, Jr. appeals from the judgment denying his petition for post-conviction relief following an evidentiary hearing. For the reasons set forth below, we affirm.

**I.**

**FACTS AND PROCEDURE**

In January 2009, a detective went to Leonard's home to discuss allegations that Leonard had engaged in sexual conduct with a minor. Leonard agreed to speak with the detective and rode to the police station in the detective's vehicle, where he was advised of his *Miranda*[1] rights. Leonard denied any sexual contact with the minor and agreed to the detective's request that he submit to a polygraph test. Upon Leonard's request, the test was scheduled for the next day and

_____

[1]     *See Miranda v. Arizona*, 384 U.S. 436 (1966).

the detective agreed to transport him to the test. Later that day Leonard called the detective and told the detective he contacted an attorney who advised him to submit to the polygraph if he was telling the truth. Leonard indicated he was apprehensive about what would occur if he took the test. The detective assured Leonard he would not be taken to jail following the test and that if he passed the test, he would most likely be cleared as a suspect.

The detective picked Leonard up the next day and transported him to the station for administration of the polygraph test, again informing Leonard he was not under arrest. A second detective informed Leonard of his *Miranda* rights at the station. Leonard agreed to proceed with the test, but stated he did not want to discuss "anything" afterward. During the test, Leonard was asked questions regarding his personal sexual behavior, as well as whether he engaged in sexual conduct with the minor, the latter of which he continued to deny. After the test was completed, a detective asked if Leonard wanted to discuss the results. Leonard agreed and was told he failed the test. The detectives told Leonard that they believed he was lying and, given the evidence gathered, "it was not looking good for his part." Leonard requested counsel before he would continue talking. The interview ended and the detective gave Leonard a ride back to his residence. On the way back, Leonard inquired as to the next step in the investigation and was told the case would potentially go to a grand jury who would determine whether the case would go forward. When they arrived at Leonard's residence, Leonard opened the car door and then asked the detective "how long it would take to come to the police department and confess" and indicated he did not have money to hire an attorney. After inquiring and being told by an officer that he could not be appointed an attorney until he was arrested, Leonard said he felt he should return to the station and explain what had happened. At the station, Leonard was again advised of his *Miranda* rights and confessed to engaging in sexual contact with the victim.

Leonard was charged by indictment with lewd conduct with a minor. Pursuant to a plea agreement, he pled guilty, and following a period of retained jurisdiction, was sentenced to a unified term of twenty years, with three years determinate. He filed a petition for post-conviction relief alleging several claims, including that his trial counsel had been ineffective for failing to file a motion to suppress his confession on the basis that his *Miranda* rights were violated. The district court held an evidentiary hearing on the petition, at which Leonard's trial counsel testified he did not file a motion to suppress because he did not believe it would succeed given his assessment that Leonard was not in "custody" at the time he invoked his right to

2

counsel. The district court agreed and issued a written order and subsequent judgment denying the petition. Leonard now appeals.

## II.

## ANALYSIS

Leonard contends the district court erred in denying his petition for post-conviction relief after an evidentiary hearing because he proved he received ineffective assistance of counsel at trial due to counsel's failure to file a motion to suppress his confession. In order to prevail in a post-conviction proceeding, the petitioner must prove the allegations by a preponderance of the evidence. Idaho Code § 19-4907; *Stuart v. State*, 118 Idaho 865, 869, 801 P.2d 1216, 1220 (1990); *Baxter v. State*, 149 Idaho 859, 861, 243 P.3d 675, 677 (Ct. App. 2010). When reviewing a decision denying post-conviction relief after an evidentiary hearing, an appellate court will not disturb the lower court's factual findings unless they are clearly erroneous. Idaho Rule of Civil Procedure 52(a); *Dunlap v. State*, 141 Idaho 50, 56, 106 P.3d 376, 382 (2004); *Russell v. State*, 118 Idaho 65, 67, 794 P.2d 654, 656 (Ct. App. 1990). The credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence are all matters solely within the province of the district court. *Dunlap*, 141 Idaho at 56, 106 P.3d at 382; *Larkin v. State*, 115 Idaho 72, 73, 764 P.2d 439, 440 (Ct. App. 1988). We exercise free review of the district court's application of the relevant law to the facts. *Baxter*, 149 Idaho at 862, 243 P.3d at 678.

A claim of ineffective assistance of counsel may properly be brought under the Uniform Post-Conviction Procedure Act. *Barcella v. State*, 148 Idaho 469, 477, 224 P.3d 536, 544 (Ct. App. 2009). To prevail on an ineffective assistance of counsel claim, the petitioner must show that the attorney's performance was deficient and that the petitioner was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Self v. State*, 145 Idaho 578, 580, 181 P.3d 504, 506 (Ct. App. 2007). To establish a deficiency, the petitioner has the burden of showing that the attorney's representation fell below an objective standard of reasonableness. *Aragon v. State*, 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988); *Knutsen v. State*, 144 Idaho 433, 442, 163 P.3d 222, 231 (Ct. App. 2007). Where, as here, the petitioner was convicted upon a guilty plea, to satisfy the prejudice element, the petitioner must show there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial. *Plant v. State*, 143 Idaho 758, 762, 152 P.3d 629, 633 (Ct. App. 2006). This

3

Court has long adhered to the proposition that tactical or strategic decisions of trial counsel will not be second-guessed on appeal unless those decisions are based on inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. *Gonzales v. State*, 151 Idaho 168, 172, 254 P.3d 69, 73 (Ct. App. 2011).

In a post-conviction proceeding challenging an attorney's failure to pursue a motion in the underlying criminal action, the district court may consider the probability of success of the motion in question in determining whether the attorney's inactivity constituted ineffective assistance. *Lint v. State*, 145 Idaho 472, 477, 180 P.3d 511, 516 (Ct. App. 2008). Where the alleged deficiency is counsel's failure to file a motion, a conclusion that the motion, if pursued, would not have been granted by the trial court, is generally determinative of both prongs of the *Strickland* test. *Lint*, 145 Idaho at 477-78, 180 P.3d at 516-17. Thus, we must determine whether a motion to suppress, had it been filed in this case, would likely have been granted by the trial court.

At the evidentiary hearing on his post-conviction petition, Leonard testified he raised the possibility of filing a motion to suppress with his trial counsel based on his request for counsel during his second interview with police, prior to his confession. Trial counsel testified he reviewed the discovery relevant to Leonard's confession and determined there was not a valid argument to suppress because Leonard was not in custody when he invoked his right to counsel such that *Miranda* applied. The district court denied this claim in a memorandum opinion, determining Leonard's confession was "freely and voluntarily given" after he received *Miranda* warnings although not in custody and, therefore, it was not ineffective assistance for trial counsel to fail to file a motion to suppress.

In *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010), the United States Supreme Court explained the origins and the parameters of the right to counsel pursuant to the Fifth Amendment[2] as follows:

---

[2] Strictly speaking, there is no "Fifth Amendment right to counsel." *See State v. Hurst*, 151 Idaho 430, 433 n.2, 258 P.3d 950, 953 n.2 (Ct. App. 2011). Instead, as explained in *Maryland v. Shatzer*, 559 U.S. 98 (2010), the right to be informed of and to the presence and assistance of counsel is afforded in custodial contexts, in limited circumstances, in order to protect a suspect's Fifth Amendment right against compelled self-incrimination during interrogation. *See Hurst*, 151 Idaho at 433 n.2, 258 P.3d at 953 n.2; *Hughes v. State*, 148 Idaho

The Fifth Amendment, which applies to the States by virtue of the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964), provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amdt. 5. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation. *Id.*, at 467. The Court observed that "incommunicado interrogation" in an "unfamiliar," "police-dominated atmosphere," *id.*, at 456-457, involves psychological pressures "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," *id.*, at 467. Consequently, it reasoned, "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Id.*, at 458.

To counteract the coercive pressure, *Miranda* announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney. *Id.*, at 444. After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. *Id.*, at 473-474. Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. *Id.*, at 474. Critically, however, a suspect can waive these rights. *Id.*, at 475. To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary under the "high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst*, 304 U.S. 458 (1938)." *Id.*, at 475.

It is undisputed that Leonard requested counsel immediately after he was informed he failed the polygraph test. If this request constituted a valid invocation of his Fifth Amendment right to counsel, the detectives' subsequent interrogation of Leonard without his counsel present was unlawful, and Leonard's statements were subject to suppression absent a waiver of those rights. However, we recently held that a person may not invoke a Fifth Amendment right to counsel, with the prophylactic effect of cutting off questioning without an attorney present, if the person is not in *custody*. *State v. Hurst*, 151 Idaho 430, 436, 258 P.3d 950, 956 (Ct. App. 2011). Custody for *Miranda* purposes means a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Hurst*, 151 Idaho at 436, 258 P.3d at 956. It requires more than a circumstance where a suspect was not free to leave. *Shatzer*, 559 U.S. at 112 ("Our cases make clear, however, that the

_____

448, 457, 224 P.3d 515, 524 (Ct. App. 2009). The term has evolved as a shorthand way of describing the right involved.

freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody."). The determination of custody does not depend on the subjective views harbored by either the interrogating officers or the person being questioned. *Stansbury*, 511 U.S. at 323; *Hurst*, 151 Idaho at 436, 258 P.3d at 956. Instead, the test is an objective one and "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *Hurst*, 151 Idaho at 436, 258 P.3d at 956. A court considering whether an individual is in custody should consider the totality of the circumstances surrounding the interrogation. *State v. James*, 148 Idaho 574, 577, 225 P.3d 1169, 1172 (2010); *Hurst*, 151 Idaho at 436, 258 P.3d at 956. Factors to be considered by the court include the time and location of the interrogation, the conduct of the officer or officers, the nature and manner of the questioning, and the presence of other persons. *Hurst*, 151 Idaho at 436, 258 P.3d at 956; *State v. Albaugh*, 133 Idaho 587, 591, 990 P.2d 753, 757 (Ct. App. 1999); *State v. Medrano*, 123 Idaho 114, 117-18, 844 P.2d 1364, 1367-68 (Ct. App. 1992). The burden of showing custody rests on the defendant seeking to exclude evidence. *State v. Munoz*, 149 Idaho 121, 129, 233 P.3d 52, 60 (2010); *James*, 148 Idaho at 577, 225 P.3d at 1172.

On appeal, Leonard contends he was in custody when, after being told he "failed" the polygraph test, he invoked his right to counsel. He contends the fact he voluntarily went to the police station and was told by the officer he was not under arrest is not dispositive. Rather, he argues the overall atmosphere of the encounter resulted in his being in custody, including the fact he was "isolated and in a police dominated atmosphere," the oppressive nature of which was "enhanced" given that he was dependent on the detective for transportation to and from the station. He also points to the fact he had submitted to a polygraph test, which is "a procedure most people would find quite intimidating even if it did not involve the highly personal questions presented to [him]" in this instance. Further, he argues it is significant that after he was advised of his *Miranda* rights and agreed to submit to the test, he reiterated he did not wish to discuss anything after the test was completed, but yet the detectives disregard this directive to "limit the scope of his waiver" by asking if he wanted to know the results of the test. When Leonard answered in the affirmative, the detectives indicated he had failed the test; indicated they knew he was lying; and based on the evidence they had gathered, indicated things were "not looking good" for him. Leonard contends "a reasonable person in these circumstances would believe his

freedom was restricted to a degree associated with arrest at the time [he] invoked his right to counsel."

The weight of authority in Idaho contravenes Leonard's contention that he was in custody at the time he invoked his right to counsel. In *State v. Osborne*, 130 Idaho 365, 369-70, 941 P.2d 337, 341-42 (Ct. App. 1997), in circumstances very similar to those here, we determined the defendant was not in custody for *Miranda* purposes. In that case, police suspected the defendant of rape and contacted him at his residence. The defendant accompanied the officers in their vehicle to the police station for questioning and was never told he could not leave. He was escorted into the police station through a locked door, questioned for up to two hours and forty minutes, interviewed by two officers, and was initially unaware of why he was there. In determining this was not a custodial interrogation, however, we noted the defendant voluntarily agreed to ride with the officers to the police station, had not been intimidated into doing so, had never asked to leave once he arrived at the station, was returned home following the questioning, and there were other exits available to the defendant besides the locked door he had entered. *Osborne*, 130 Idaho at 369-70, 941 P.2d at 341-42. We further noted in *Osborne* that the facts were similar to those in *State v. Birkla*, 126 Idaho 498, 887 P.2d 43 (Ct. App. 1994) and *Medrano*, 123 Idaho 114, 844 P.2d 1364, in which this Court also held the respective defendants were not in custody for *Miranda* purposes. In *Birkla*, an officer asked the defendant to accompany him to the police station to answer questions regarding a suspected sexual assault and placed the defendant in a room the defendant thought was locked. The defendant was told he was not under arrest and was free to leave. The detective testified that the defendant voluntarily discussed the matter with the detective in order to "clear it up," and on several occasions, he was about to leave, but returned to further clarify his statements. *Birkla*, 126 Idaho at 501-02, 887 P.2d at 46-47. In addition, during questioning, the defendant voluntarily agreed to submit to a medical examination and was driven to the hospital in a patrol car and eventually driven back to the motel where he was staying. In determining the defendant was not in custody, we noted that the fact that questioning takes place in a police station does not necessarily mean a party is in custody and concluded, based on the totality of the circumstances, that the district court did not err in finding the defendant was not in custody at the time. *Id.* at 502, 887 P.2d at 47.

Similarly in *Medrano*, the defendant argued he was in custody when he made certain admissions, pointing out that he was transported to the station by police and had no independent

7

transportation to leave if he wished, was a suspect and a focus of the investigation into the abduction and sexual assault of a young girl, and the purpose of the interrogation was to elicit information upon which criminal charges could be based. Although noting the fact the defendant went to the station voluntarily was not dispositive, we nonetheless affirmed the district court's finding, based on the totality of the circumstances, that the defendant was not in custody at the time at issue. *Medrano*, 123 Idaho at 117-18, 844 P.2d at 1367-68. In affirming, we further noted Medrano was informed he was not under arrest, was told he was free to leave, was interviewed by only one officer, and was allowed to leave after the interview without being arrested. *Id.* *See also State v. Loosli*, 130 Idaho 398, 941 P.2d 1299 (1997) (holding the trial court correctly denied a motion to suppress a confession where the police picked the defendant up, took him voluntarily to the police station, questioned him in a small room, and informed the defendant of their opinion that a prosecution would be successful); *Jones v. State*, 125 Idaho 294, 298-99, 870 P.2d 1, 5-6 (Ct. App. 1994) (holding the defendant was not in custody where the defendant went to the police station voluntarily and freely left the station following his interview). *Cf. State v. Frank*, 133 Idaho 364, 369-70, 986 P.2d 1030, 1035-36 (Ct. App. 1999) (holding that the defendant, who had been placed in handcuffs and restricted to the police vehicle, was in custody for *Miranda* purposes).

Leonard does not acknowledge, let alone attempt to distinguish the preceding authority. Rather, his focus on appeal is that the "coercive" nature of the questioning contributed to his being in custody; he specifically points to the "highly personal" nature of the questions associated with the polygraph testing and the fact that, after he failed the test, the officers told him they believed he was lying and indicated it was not "looking good" for him. Leonard's assertion regarding the invasive nature of questioning is not particularly convincing. In several of the cases discussed above the nature of the underlying crime most certainly required questions of a sensitive nature, none of which resulted in a finding that the defendant was in custody. *See, e.g.*, *Osborne*, 130 Idaho 365, 941 P.2d 337 (defendant was questioned regarding his suspected participation in a rape, which ultimately ended in him admitting a sexual encounter, but insisting it had been consensual); *Birkla*, 126 Idaho 498, 887 P.2d 43 (defendant faced questions regarding his suspected involvement in a sexual assault); *Medrano*, 123 Idaho 114, 844 P.2d 1364 (defendant faced questions regarding his suspected involvement in the abduction and sexual assault of a young girl).

As to the overall "coercive" nature of the atmosphere, including the officers' statements that they believed Leonard was lying and that it wasn't "looking good" for him, as we indicated above, the conduct of the questioning officers, as well as the nature and manner of their questions, is certainly relevant. *See Hurst*, 151 Idaho at 436, 258 P.3d at 956. However, we do not regard the tone apparent from the record to have been so coercive as to have transformed Leonard's voluntary trip to the station into a custodial encounter. *State v. Silva*, 106 Idaho 14, 674 P.2d 443 (Ct. App. 1983) provides guidance on the issue. In that case, the defendant received a message that officers wished to question him regarding the body of a woman they had found. The defendant voluntarily went to the police station where he expressed some hesitancy in telling the officers what he knew about the death of the victim. Officers continued the conversation, indicating the defendant was not under arrest. After considerable back and forth between the parties, one officer stated:

> I'm not going to say you won't be charged with something, but you're not going to go to jail tonight if you tell the truth. I'm not telling you that you're going to jail if you don't talk but, what I mean is, damn it, we have got a girl that is dead and we just can't ignore that. You know that.

*Id*. at 18, 674 P.2d at 447. The defendant proceeded to make incriminating statements, which he argued on appeal should have been suppressed as a violation of his *Miranda* rights. This Court determined the defendant was not in custody, relying on several United States Supreme Court cases finding that a defendant who came voluntarily to the police station, submitted to relatively brief questioning, and was allowed to freely leave the station was not in custody for purposes of *Miranda*. *Silva*, 106 Idaho at 19-20, 674 P.2d at 448-49 (citing *California v. Beheler*, 463 U.S. 1121 (1983); *Oregon v. Mathiason*, 429 U.S. 492 (1977)).

The "pressure" applied by officers on Leonard in this case was no greater than that applied in *Silva* and did not amount to a level sufficient to transform this into a custodial circumstance. *Accord Loosli*, 130 Idaho 398, 941 P.2d 1299 (holding there was no custodial interrogation where, among other circumstances, while the police were questioning the defendant they informed him of the evidence against him and relayed their opinion that a prosecution would be successful). Furthermore, Leonard's assertion that the officers "disregarded [his] earlier attempt to limit the scope of his waiver" is premised on Leonard actually having invoked his *Miranda* rights; however, as we conclude below, Leonard was not in custody such that his *Miranda* rights could have been invoked. Finally, we note in regard to the alleged "coercive"

9

atmosphere, that there was no use of physical force or handcuffs and there was no indication Leonard was ever impeded physically in that he was prohibited from standing and/or leaving the room upon his request. In fact, the record indicates the detective freely drove Leonard back to his residence shortly after Leonard requested an attorney. *Accord Hurst*, 151 Idaho at 437, 258 P.3d at 957 (noting the detective had not touched, handcuffed, or otherwise physically restrained Hurst in its holding that the defendant was not in custody for purposes of *Miranda*).

This case is not distinguishable from the line of United States Supreme Court and Idaho cases holding that voluntary trips to the police station that resulted in the defendant giving incriminating statements were not custodial. Like in those cases, Leonard voluntarily went to the police station, was told he was not under arrest, and was allowed to leave at the conclusion of questioning. The fact that he was reliant on an officer for transportation is not dispositive, *see Medrano*, 123 Idaho at 118, 844 P.2d at 1368, and although he was subjected to personal questions of a sexual nature during the polygraph test, he has not shown this transformed the consensual nature of the encounter. Nor are we convinced that the officers were so coercive as to override the voluntary nature of his presence at the station. Based on the totality of the circumstances in this instance, Leonard was not in "custody" for purposes of *Miranda* when he invoked his right to counsel. Therefore, any subsequent questioning, including that leading to his confession, was not in violation of his Fifth Amendment rights.

In the alternative, Leonard contends that, even if no *Miranda* warnings would have been required in these circumstances (because he was not in custody), the rule this Court announced in *Hurst*, 151 Idaho at 436, 258 P.3d at 956, that a person must be in custody to invoke their right to counsel, "should not be extended to circumstances such as these where the suspect was actually informed he has the right to counsel and then invoked that right when in a highly coercive environment." Leonard argues *Hurst* is distinguishable because, in this case, the detectives informed Leonard he had the right to an attorney prior to interrogation and the interrogation proceeded under allegedly coercive circumstances, while in *Hurst*, we found the defendant was not in custody where police approached him in the lobby of his workplace and without the officers informing him of his *Miranda* rights, he indicated he would not speak to them without counsel present. *Hurst*, 151 Idaho at 437, 258 P.3d at 957. Given the different circumstances, Leonard argues, it "cannot be said that [he] had no right to invoke the right police informed him that he had, even if the circumstances were not coercive enough to trigger the requirement that

the [*Miranda*] warnings be given." However, that the facts of *Hurst* are distinguishable to a degree from those in this case has no effect on the fact that in *Hurst* we announced a "bright-line rule" that "a person may not invoke a Fifth Amendment right to counsel, with the prophylactic effect of cutting off questioning without an attorney present, if the person is *not in custody*." *Hurst*, 151 Idaho at 436, 258 P.3d at 956 (emphasis added). We decline Leonard's invitation to depart from this clear and unequivocal statement of law in regard to a defendant's invocation of *Miranda* rights.[3]

Because we have determined Leonard was not in custody when he requested counsel, a motion to suppress, had if been filed, would not likely have been successful. As we noted above, such a conclusion is generally determinative of both prongs of the *Strickland* test, which is the case here. *Lint*, 145 Idaho at 477-78, 180 P.3d at 516-17. Accordingly, the district court did not err in denying Leonard's petition for post-conviction relief. The judgment denying Leonard's petition for post-conviction relief is affirmed.

Judge LANSING and Judge GRATTON **CONCUR.**

---

[3]     Because we have determined Leonard was not in custody when he requested counsel and, therefore, his request did not have the "prophylactic effect" of requiring a cessation of questioning, we need not reach the issue of whether Leonard waived such rights prior to returning to the station and offering his confession.

11